# EXHIBIT A

SUPREME COURT
KINGS COUNTY

LAUREN SOARES,

                              Plaintiff,

                              — against —

CITY OF NEW YORK, JOSHUA JONES, and
JOHN DOE 1

                              Defendants.

Index No. _____

SUMMONS

JURY TRIAL DEMANDED

        To the above-named Defendants: You are hereby summoned to answer
the complaint in this action, and to serve a copy of your answer, or, if the complaint is
not served with this summons, to serve a notice of appearance on the Plaintiff's attorney
within twenty days after the service of this summons, exclusive of the day of service,
where service is made by delivery upon you personally within the state, or, within 30
days after completion of service where service is made in any other manner.  In case of
your failure to appear or answer, judgment will be taken against you by default for the
relief demanded in the complaint.  The basis of venue is the location where the claims
arose.

TO:

THE CITY OF NEW YORK
New York City Law Department
100 Church Street New York,
New York 10007

P.O. Josh Jones
New York City Police Department
CRC Command
1 Police Plaza
Room 1109
New York, New York 10005

Dated: New York, New York
June 21, 2021

WERTHEIMER LLC

By:_____

Joel A. Wertheimer
14 Wall Street, Suite 1603
New York, New York 10005
(646) 720-1098
joel@joelwertheimer.com

2

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 4 of 39 PageID #: 7

SUPREME COURT
KINGS COUNTY

---

LAUREN SOARES,

                              Plaintiff,

                    — against —

CITY OF NEW YORK, JOSHUA JONES, and
JOHN DOE 1

                              Defendants.

---

Index No. _____

COMPLAINT

JURY TRIAL DEMANDED

## PRELIMINARY STATEMENT

1.      Plaintiff Lauren Soares attended a May 30, 2020 protest in Flatbush

in Brooklyn, New York.  The protest was one of a number in response to the killing of

George Floyd, which sparked a wave of protest across the country.

2.      In an effort to instill fear and chill the speech of the protestors like

Ms. Soares, the New York Police Department repeatedly arrested and detained

protestors illegally.

3.      Protestors were subjected lengthy and unnecessary arrest

processing, at the height of the COVID-19 pandemic.  Ms. Soares was among those

protestors subjected to lengthy and unnecessary arrest.

4.      In contrast, the same police department has responded to other

protests, including anti-COVID restriction protests and "Blue Lives Matter" protests

with virtually no arrests or physical violence.

5.      NYPD members receive insufficient training related to policing and

3

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 5 of 39 PageID #: 8

use of force in connection with First Amendment assemblies, because the core training treats protest activities as forms of civil unrest, like riots, and focuses on disrupting and demoralizing protests rather than encouraging and facilitating them, unless the Department's leadership agrees with the message of the protest.

## PARTIES

6.  Plaintiff Lauren Soares is a resident of Brooklyn, New York.

7.  Defendant City of New York is a municipal corporation in the State of New York.

8.  Defendant Josh Jones is an officer in the New York City Police Department who participated in Ms. Soares's arrest.

9.  Defendant John Doe #2 is a New York City Police Department Captain who ordered Ms. Soares's arrest.

## JURISDICTION

10.  This Court has jurisdiction over this action pursuant to general jurisdiction under the New York State Constitution.

## VENUE

11.  Venue is proper under CPLR § 503(a) because a substantial part of the events giving rise to the claim occurred in Kings County, New York.

## FACTS

12.  On May 28, 2020, days after George Floyd's death, protests began across New York City.  One protest in Union Square saw a mobilization of hundreds of NYPD officers in response who made several arrests.  A group of protestors marched to

4

Case 1:21-cv-04092-WFK-VMS Document 1-1 Filed 07/21/21 Page 6 of 39 PageID #: 9

City Hall where officers kettled them with bicycles, and arrested approximately 75 people.

13.     Protests continued on May 29th at Foley Square and Barclays Center.  At Barclay's Center, NYPD officers peppered sprayed and struck protesters with batons.

14.     Protests continued on May 30th.  Ms. Soares attended a protest in Flatbush, Brooklyn, NY that evening.

15.     The NYPD continued to arrest and harass protestors against police violence throughout June 2020.

**NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations**

16.     The NYPD's violent response to protests against police brutality was dramatically different from their response to other kinds of protests and rallies in the summer and fall of 2020.

17.     For example, on July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn.  Pro-police marchers yelled at and antagonized counter protestors against police brutality, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces.  The NYPD made no arrests at the rally.

18.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn.  The march was attended by counter protestors organized against police brutality.  Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of

5

NYPD officers, only two people were arrested – both Black men protesting police brutality.  By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.

19.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo.  The protestors set fires in the street and threw masks into the flames.  They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest.  An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks.  Police said that no arrests or summons were issued to the protestors on the night of the rally.

### Reports and Investigations into the 2020 Protests

20.     In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").

21.     The AG Report also found the pervasive use and misuse of tightly fastened flex- cuffs during arrests, NYPD officers covering their badge numbers, and failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

22.     In December of 2020, the NYC Department of Investigation also issued a report examining the NYPD's conduct in response to the protests ("DOI Report").

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 8 of 39 PageID #: 11

23.     The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.

24.     In addition to the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."

25.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to First Amendment expression.

26.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

27.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed the latter during the 2020 protests.

28.     NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests, but failed to adequately prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

29.     Numerous lawsuits arising out of the 2020 arrests have challenged the NYPD's misconduct, including, *Payne* et al. *v. de Blasio* et al. No. 20-cv-08924 (S.D.N.Y.), *Gelbard et al. v. City of New York et al.*, 20-cv-3163 (E.D.N.Y.), *Sierra et al. v.*

7

*City of New York et al.*, 20-cv 10291 (S.D.N.Y.), *Jeffrey v. City of New York et al.*, 20-cv-2843

(NGG) (RML), (E.D.N.Y.), and *People of the State of New York v. City of New York et al.*, 21-

cv-0322, (S.D.N.Y.), among others.

### Ms. Soares is Arrested With Excessive Force

30.    At 10:00 p.m. on the night of May 30, 2020, Ms. Soares was

marching on Church Avenue in Brooklyn to protest police violence.

31.    She attended the protest with her friend Adam.

32.    She was walking on the sidewalk with a group of ten to fifteen

people.

33.    They were marching and chanting against police brutality.

34.    While walking on the sidewalk with that small group of people, a

group of officers in similar number stopped them on the street, forming a barricade that

stopped them from walking.

35.    As they were stopped the marchers, included Ms. Soares, started

chanting "hands up, don't shoot."

36.    After approximately five minutes, a senior officer, Defendant John

Doe # 2, wearing a white shirt ordered the uniformed police officers to "arrest them

all."

37.    Immediately upon hearing that command, Defendant Jones

grabbed Ms. Soares, twisted her arms behind her back, and threw her up against a wall.

38.    The officer called her a "bitch" and a "cunt" with her body pressed

into the wall, and placed her in handcuffs.

8

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 10 of 39 PageID #: 13

39.     The handcuffs were sufficiently tight to cause her wrist pain while she was cuffed for hours.

40.     The arresting officer, Defendant Jones, then took Ms. Soares to a van nearby. She was held alone in that van with her arresting officer.

41.     Ms. Soares was held in the van for half an hour.

42.     She was then taken to 1 Police Plaza, where she sat in the van with her arresting officer, who had called her a "cunt," for another two hours.

43.     She was then taken into 1 Police Plaza, where she was photographed with her arresting officer and detained for four more hours before being released.

### The NYPD's Historical Policy and Practice of Violently Disrupting Protected First Amendment Activity

44.     The extensive deprivation of constitutional rights during the 2020 protests is directly attributable to the City's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar protests over the past twenty years, at protests including those against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

45.     The NYPD response to the protests in New York City in May and June 2020 was in line with its history of violent and unconstitutional responses to those as other past protests in New York City, including its treatment of First Amendment

assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

46. For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray and batons strikes to disperse, and "kettling" to move protestors from specific locations to effectuate mass arrests.

47. The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests.

48. The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.

49. Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Laywers Guild – New York City Chapter Legal Observers, as well as "kettling" tactics to move protestors or initiate mass arrests.

50. Additionally, the NYPD have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

51. Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to

mass arrests and violations of their First Amendment and other, related rights, much in the same manner as have the Plaintiff in this case.

52.     Indeed, in Plaintiff's case, the NYPD employed tactics developed and modified over the course of many years by the NYPD and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.      *Mandal v. City of New York.,* 02 Civ. 1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 02 Civ. 6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment- based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.      *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

11

c.      *Haus v. City of New York,* 03 Civ. 4915 (RWS)(MHD) 2006 WL 1148680, \*1 (S.D.N.Y.  April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04 Civ. 0665 (RWS) (S.D.N.Y.);

d.      *Kunstler v. City of New York*, 04 Civ. 1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest.  Defendant City of New York settled this litigation with payment in excess of $2,000,000;

e.      *MacNamara v. City of New York*, 04 Civ. 9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt.  No. 200-2), *Abdell.  v. City of New York*, 05 Civ. 8453 (RJS)(JCF) (S.D.N.Y.), *Schiller.  v. City of New York*, 04 Civ. 7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04 Civ. 7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06 Civ. 2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt.  No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y.  arising from arrests made, and policies related to, the RNC in New York City in 2004.  *See, e.g., Schiller*, No. 04 Civ. 7922 (RJS)(JCF), 2008 WL 200021 at \*2-5 (S.D.N.Y.  Jan.  23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia,* "constitutional challenges to the defendants' alleged practice of detaining .  .  .  all persons in connection with the RNC .  . .  no matter how minor theinfraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D.  125, 154 (S.D.N.Y.  2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04 Civ. 7921 (RJS)(JCF), 2012 WL 4513352, at \*13-15 (S.D.N.Y.  Sept.  30, 2012) (grating plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 14 of 39 PageID #: 17

arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

f.      *Callaghan v. City of New York,* 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

g.      *Osterhoudt v. City of New York, et al.*, No. 10 Civ. 3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

h.      Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"25 there were more than sixty civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14 Civ. 5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listed by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y.);

i.      Others have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT); *(Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT);

j.      The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14 Civ. 9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 15 of 39 PageID #: 18

*Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F Supp 3d 372 (SDNY 2017) ("*Case I*"); 408 F.Supp.3d 313 (SDNY 2019) ("*Case II*");

k.      Those cases, and several of the OWS-related cases referred to above, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

l.       The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

m.      *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.*, First Amended Complaint at Paragraph 415).

### The NYPD's Failure to Train

53.      Since at least the 1990's, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies.

54.      In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

55.      In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

56.      Upon information and belief, to this day, that document forms the core of today's NYPD protest response-related training.

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 16 of 39 PageID #: 19

57.     The Disorder Control Guidelines treat disorders as military
engagements and copies military tactics and focus on tactics designed to *deter, disperse,
and demoralize* groups, such as disorder control formations and making mass arrests.

58.     Upon information and belief, Disorder Control Guidelines were
never meant to be guidelines for the policing of lawful First Amendment assemblies
such as demonstrations – only for large-scale civil disorder such as riots.

59.     However, neither the Disorder Control Guidelines, nor, upon
information and belief, any related NYPD training, contain meaningful direction on the
core First, Fourth, or Fourteenth Amendment principles that must guide constitutional
policing of First Amendment assemblies.

60.     For example, upon information and belief, there is virtually no
NYPD training— and certainly no *meaningful* NYPD training—focusing on how to
utilize the tactics described in the Disorder Control Guidelines without infringing on
the constitutional rights of protesters, such as how to make probable cause
determinations or the requirements of providing an alternative avenue of protest,
meaningful time and a path of egress when issuing a dispersal order, and the like.
Although the above, and related, problems with the NYPD's training are endemic and
cut across all of the relevant NYPD training, at present, Defendant City has a policy and
practice of deploying one particularly problematic, inadequately trained, poorly
supervised and disciplined group of NYPD members: the NYPD's Strategic Response
Group ("SRG").

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 17 of 39 PageID #: 20

61.     The SRG, deployed around the City at protests in 2020 was created in 2015 as a specialized unit tasked with responding to disorder- causing events and to conduct counter-terrorism operations.

62.     The SRG has a unit in each of the five boroughs and the Disorder Control Unit has now been incorporated into the SRG.

63.     In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations.  They'll have no role in protests.  Their response is single-fold.  They'll be doing counter-terror work.  They'll be assigned to different posts throughout the city."

64.     However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

65.     Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, among other places, by CCRB complaints, and in numerous lawsuits.

66.     SRG members are meant to have additional DCU training.

67.     Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

68.     However, many of the officers deployed to respond to the protests in 2020, did not even receive *that* training, which was supposedly required of them.

16

Case 1:21-cv-04092-WFK-VMS Document 1-1 Filed 07/21/21 Page 18 of 39 PageID #: 21

69.     As a result, as a report by the Corporation Counsel for the City of New York ("OCC Report") noted, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."

70.     Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies, as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

71.     Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

72.     For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03 Civ. 2829 (KMW) (GWG) (SDNY).

Case 1:21-cv-04092-WFK-VMS Document 1-1 Filed 07/21/21 Page 19 of 39 PageID #: 22

73.     Those reports praise employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

74.     After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC- related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

75.     For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after-action reviews undertaken between the 2004 Republican National Convention and until the events of the George Floyd protests.

76.     Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with perceived First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the involved in mass arrests related to police actions taken in

relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

77. Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing

78. For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.), the City of New York testified that in regards to protest police training it did not review: (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

79. As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

80. For example, in a 2017 deposition, Defendant City could identify no impact litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or training.

81. Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."

82.     Mayor de Blasio directed the DOI and the Corporation Counsel to produce the DOI and Corporation Counsel reports referred to herein.

83.     While both City agencies made reports and recommendations that include what may be characterized as critiques of some NYPD protest-related training, neither the DOI nor the Corporation Counsel, nor any other City agency, has released the contents of that training – despite that much of its core contents are already publicly available, including on the public docket in *Case, et al. v. City of New York, et al.*, 14 Civ. 9148 (AT)(BCM).

84.     At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests - despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years – demonstrates both a history, and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiff and other similarly injured protesters.

### The NYPD's Failure to Train on Sidewalk Protests

85.     In particular, the NYPD's failure to train its officers regarding a constitutionally appropriate response to sidewalk protests caused Ms. Soares's illegal arrest.

86.     The NYPD's over-zealous and unlawful application of the disorderly conduct and obstructing governmental administration statutes was not

restricted to the many protests in lower Manhattan, but also to smaller protests in the outer-boroughs.

87.     For example, on October 3, 2011, in the Bronx, protesters were arrested for disorderly conduct on the false pretext that they were obstructing pedestrian traffic (hereinafter, the "Bronx Incident"). The Bronx Incident was filmed, and in fact, the sidewalk was wide open, with only a handful of protesters, a news reporter, and the police present.

88.     Regardless, an NYPD Captain gave orders to the protesters to stop "blocking the sidewalk," and informed a Sergeant on the scene to "have the protesters continuously walk around" and ordered his subordinates to arrest anyone who stopped walking.

89.     In response to this outrageous and unlawful application of the disorderly conduct statute to protesters on an empty sidewalk, State and City legislators sent complaints to the City and the NYPD raising concerns about the police conduct.

90.     On December 13, 2011, New York State Senator Liz Krueger sent a letter to NYPD Commissioner Ray Kelly, Mayor Michael Bloomberg, and then-Public Advocate Bill de Blasio objecting to the police procedures used at Occupy Wall Street sidewalk protests. Senator Krueger specifically warned "that these practices appear to interfere with peaceful and legal protest behavior . . . ." Senator Krueger described the arrests at an Occupy Wall Street demonstration in the Bronx, and provided a link to YouTube video footage of the incident, stating, "This video shows a demonstration that does not appear to be blocking the sidewalk, since the protesters are all lined up against

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 23 of 39 PageID #: 26

a fence out of the main pedestrian pathway, but police officers insist that the protesters

must move.  They then begin arresting protesters, apparently any time an individual

stops walking, and an officer is heard telling the police to arrest anyone who is not

moving.  While I understand the need to make sure sidewalks are not blocked, the

police behavior does not seem related to that goal." Senator Krueger provided clear

notice to Defendant that the NYPD used unconstitutional policing to silence First

Amendment sidewalk protests.

        91.     On January 19, 2012, New York City Council Member Jessica

Lappin similarly sent a letter to Commissioner Kelly conveying "serious concerns

regarding police behavior at sidewalk protests conducted by the Occupy Wall Street

Movement.  I urge you to investigate and clarify the procedures and tactics used by the

NYPD at these events." Council Member Lappin also described the Bronx

demonstration: "In this video, protesters appear to leave plenty of room on the

sidewalk for pedestrian traffic.  However, police officers insist that the protesters move

and arrest anyone who does not walk away." Lappin concludes, "I am concerned that

this type of police behavior is interfering with protesters' First Amendment rights."

Council Member Lappin provided clear notice to Defendant that the NYPD used

unconstitutional policing to silence First Amendment sidewalk protests.

        92.     The resulting internal NYPD investigation failed to evaluate the

legality of the arrests or the police behavior that interfered with the First Amendment

rights of the protesters.  The investigation was so lackluster that the Captain on-scene

Case 1:21-cv-04092-WFK-VMS  Document 1-1  Filed 07/21/21  Page 24 of 39 PageID #: 27

for the Bronx Incident was not even interviewed, nor were any recommendations made to address the clearly unlawful police behavior.

93.     This incident was highly indicative of the policing of protests during the Fall of 2011 and Spring of 2012, as the NYPD continued to arrest numerous Occupy Wall Street protesters under the auspices of the disorderly conduct and obstructing governmental administration statutes.

94.     The NYPD has not update its policing of protests in the wake of the Occupy Wall Street cases.

95.     On November 5, 2011, The New York Times wrote about the improper arrest of Occupy Wall Street protesters that occurred upon a march reaching Foley Square: Hundreds of Occupy Wall Street demonstrators streamed into a desolate part of Foley Square on Saturday afternoon, but their slow-moving march turned chaotic as a phalanx of police officers issued orders to vacate the sidewalks — and then swept in to force the issue.…  As the confrontation continued, the police kept yelling orders that the sidewalk was closed, or temporarily closed, or had to be closed to keep order.  They fanned out in a line, stretching orange mesh netting across the breadth of the sidewalk, and walked along, pushing protesters back and sweeping them away.

96.     As the NYPD aggressively policed these protests, the fact that it was unconstitutionally arresting protesters by improperly applying the disorderly conduct and obstructing governmental administration statutes on a wide-scale became inescapable.

97.      For example, on October 20, 2011, the New York Civil Liberties

Union ("NYCLU") communicated to the City the need for the NYPD to issue clearer

and more consistent dispersal orders during the protests.  Per the NYCLU, "[W]e also

have been present at several locations (including two this past weekend) where police

officers aggressively dispersed people standing lawfully on city sidewalks.  While we

recognize that such dispersal orders can be appropriate in limited circumstances, we

urge the Department to be more careful with such orders." (emphasis added).  This

NYCLU statement provided clear notice to Defendant that the NYPD frequently used

unconstitutional policing to silence First Amendment sidewalk protests, yet was

ignored.

98.      Indeed, the NYCLU issued several Free Speech Threat

Assessments, detailing the ongoing "risks to the right to protest as a result of heavy-

handed NYPD policing and harassment of individuals engaged in First Amendment

Activity." For example:

99.      A March 17, 2012 – April 10, 2012 Free Speech Threat Assessment

detailed the NYPD's restriction of protester activity and movement by using barricades

and closing sidewalks.

100.      An April 11, 2012 – April 28, 2012 Free Speech Threat Assessment

detailed the NYPD's continued use of barriers against protesters, and that the barriers

themselves impeded pedestrian traffic, as well as an incident where the "supervising

officers, at random and without warning, pointed to protesters they wanted arrested for

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 26 of 39 PageID #: 29

disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration."

101.    Ms. Soares faced precisely this same fate.

102.    An April 29, 2012 – May 29, 2012 Free Speech Threat Assessment alerted that "NYPD officers would order a sidewalk to be cleared, stating the people were obstructing pedestrian traffic or that the sidewalk was closed, and shoved those assembled at random.  Sometimes protesters were forced to march in one direction only to have other officers order them to turn the march around minutes later."

103.    Following this continued aggressive policing by the NYPD, international human rights and U.S.  civil liberties experts issued the comprehensive and damning report: Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street.  Suppressing Protest detailed numerous arrests related to Occupy Wall Street, as well as the NYPD's improper and arbitrary closure of sidewalks to arrest protesters.  Suppressing Protest tellingly concluded, "The pervasive NYPD practice of frequently 'closing' sidewalks and forcibly moving along peacefully assembled individuals violates the freedoms of expression and assembly." Id. at 118 (emphasis added).

104.    Mr. Jones and John Doe # 1 undertook this precise action.

105.    The NYPD refused to meet with the authors of the report, despite their requests to speak while they were compiling their research.

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 27 of 39 PageID #: 30

106.    Complaints about the handling of protests apparently fell on deaf ears at the NYPD and the City of New York, demonstrating Defendant's deliberate policy of ignoring First Amendment rights.

107.    As an example, the large majority of Occupy Wall Street related arrests during the first year in New York City were for offenses such as disorderly conduct—a non-criminal violation akin to jaywalking.  Indeed, Mayor Michael Bloomberg recognized that, "the majority of the protesters have been peaceful and responsible." Yet, the majority of the protesters who were arrested were taken into police custody, whether for hours or for days, rather than simply being given a summons.  Furthermore, between September 17, 2011 and September 17, 2012 – in Manhattan alone – 2,644 members of OWS were arrested.  Only 409 of these arrests resulted in a plea or conviction for any charge.  That is a conversion rate of just over 15% for the thousands of Occupy Wall Street related arrests during the one-year period. The remainder of the arrests were dismissed.

108.    For comparison purposes, according to statistics collected by NYS Division of Criminal Justice Services and publicly available indicate a conversion rate for convictions for those arrested with a top charge of a misdemeanor of 55.9% in 2014, 52.6% in 2015, 52.7% in 2016, 49.3% in 2017 and 35.5% in 2018.

109.    As the low conversion rate and high decline to prosecute percentages indicate, the NYPD use disorderly conduct arrests for crowd control and free speech suppression purposes.

110.    This problem was not rectified and continued through the George Floyd Protests.  Evidence will reveal similar dismissal rates for disorderly conduct arising out of the Floyd protests.

111.    Indeed, further proof of the improper policing of members of those protests can be seen by the voluminous litigation that has arisen related to the improper policing of the constitutionally protected expressive speech activity, including numerous class actions in the Southern District of New York.

112.    Defendant City of New York knew or should have known that members of its police force would encounter individuals engaged in expressive speech activity, especially after months of continued protests, news stories, and multiple lawsuits alleging unlawful arrests.  Even so, the City of New York failed to provide adequate training to NYPD police officers in the handling of protesters exercising First Amendment rights.

113.    For over 20 years, Defendant deliberately ignored evidence that it was illegally policing protest.

114.    Despite receiving the aforementioned notice of significant constitutional violations in NYPD policing of sidewalks protest, Defendant did not provide any specialized trainings on the subject.

115.    NYPD training begins at the Police Academy before recruits graduate to become police officers.  Following graduation from the academy, NYPD members of service receive in- service training which includes mandatory topics such as firearms and taser proficiency and the use of defibrillators, as well as a number of

27

elective courses depending on the rank and unit of the member.  Members of service are also required to take trainings to be promoted.  In addition, the NYPD may direct its members to participate in department-wide training on a variety of issues, such as counter-terrorism.  Executive Officers (captains and higher in rank) are provided additional discretion in choosing their own trainings.

116.    The bulk of NYPD training occurs in the Academy, which for executive level officers can be over 30 years prior to making arrest decisions at sidewalk protests.

117.    Following the Academy, these Executive Officers, who are tasked with the decision-making authority on evaluating probable cause determinations and whether to make arrests at sidewalk protests, are not provided any pertinent training on how to police protests, or any refresher training on constitutionally compliant sidewalk protest policing.  Instead, the NYPD relies only on the Academy training to cover these issues.

118.    John Doe #1 in Ms. Soares's case who ordered the arrest likely had not received any training in decades.

119.    As noted by Lt.  Vega of the Disorder Control Unit ("DCU") of the NYPD, "Crowd control is a perishable skill.  If you don't practice it, you start to learn—I mean you forget what you learned when it comes to that." The same is true for those aspects of policing sidewalk protests that relate to the First Amendment rights of protesters, which are entirely omitted from executive training as described below.

120.    The City did not provide any lectures or trainings for executive

level officers concerning:

a.   Policing public assemblies, marches, or demonstrations;

b.   The constitutional right of individuals and groups to protest on

sidewalks;

c.   Arresting protesters engaged in First Amendment speech activity;

d.   The interplay of First Amendment principles and policing public

assemblies, demonstrations, or protests;

e.   Application of the disorderly conduct statute consistent with the First

and Fourth Amendment rights of protesters;

f.   Enforcement of Penal Law 240.20 (5) & (6) (disorderly conduct);

g.   Enforcement of Penal Law 195.05 (obstruction of governmental

administration);

h.   Well-established New York State law that the "mere inconveniencing"

of pedestrians is not a violation of the disorderly conduct statute;

i.   The use and legal requirements for dispersal orders;

j.   The use and legal requirements of alternative forums for protest; and

k.   The use and legal requirements for imposition of time, place, and

manner restrictions on protest activity.

121.    Furthermore, to prepare for the Republican National Convention of

2004, the City provided training concerning the extent of interference with pedestrian

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 31 of 39 PageID #: 34

traffic that is needed to support a disorderly conduct arrest, but has admitted that no

such training was provided after 2004.

122.    Similarly, the City has not incorporated into its post-Academy

training materials the legal ruling announced by the New York State Court of Appeals

in *People v. Jones*, 9 N.Y.3d 259 (2007) ((i) setting out the mens rea required; and (ii)

reinforcing that an arrest for disorderly conduct statute requires more than mere

inconvenience of pedestrians).

123.    The City provided no refresher courses to the executive level

officers (who are tasked with making the difficult probable cause determinations at

protests) on these relevant training subjects.

124.    A specific unit within the NYPD, the Disorder Control Unit, was

tasked with training the members of service how to respond to protests.  The Disorder

Control Unit was responsible for, among other things, conducting comprehensive

reviews of all department plans for responding to civil disorder and for developing and

recommending specialized training for crowd management and civil disorder.  The unit

also responded to civil disorders to assist commanders at the scene.

125.    The NYPD has provided no updated training on disorderly

conduct standards, First Amendment protections, sidewalk protests, or crafting

dispersal orders.

126.    Rather, in the protest guidelines provided to all members of

service, the City flatly stated, contrary to the constitutional rights of protesters and the

Case 1:21-cv-04092-WFK-VMS Document 1-1 Filed 07/21/21 Page 32 of 39 PageID #: 35

legal standards for disorderly conduct under New York State law, that "Sidewalks must remain clear to pedestrian traffic."

127. All of these failures to train on specific, relevant aspects of constitutional policing of sidewalk protest despite having received clear notice that NYPD policing of protests was causing the systemic violations of protesters' constitutional rights demonstrates a policy of disregard for First Amendment rights.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
*Pursuant to New York State Law and pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights the Fourth and Fourteenth Amendments to the United States Constitution*

128. Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

129. Defendants had no judicial warrant authorizing then to seize Plaintiff.

130. Defendants seized Plaintiff, restricting her freedom of movement, without privilege or lawful justification.

131. Plaintiff was conscious of her confinements by Defendants.

132. Plaintiff did not consent to her confinements by Defendants.

133. It was unreasonable for Defendants to believe that they had lawful cause to seize, detain, or arrest Plaintiff.

134. Thus, Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

31

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 33 of 39 PageID #: 36

135.    Those Defendants who ordered, effected, and otherwise participated in arresting Plaintiff subjected Plaintiff to unlawful seizures, false arrests, and/or searches and/or seizures of their persons and/or property.

136.    Defendants seized Plaintiff based on the perception that she was part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff based on her own, individual conduct, as opposed to the perceived "group conduct."

137.    Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

138.    Plaintiff was arrested without first ensuring that she had been given dispersal orders, meaningful opportunities to disperse, and refused to comply.

139.    That enforcement was consistent with official NYPD policy.

140.    Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiff and other perceived protesters without probable cause and/or without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

141.    For example, with respect to protestors who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

32

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 34 of 39 PageID #: 37

142.   In many cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiff and other perceived protesters, without first having given Plaintiff and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

143.   Defendants arrested Plaintiff for alleged offenses in connection with which New York Criminal Procedure Law § 150.20 required that Plaintiff receive a summons on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

144.   As a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiff to unreasonably long, onerous, punitive arrest processing, as well as obviously hazardous conditions of confinement given the COVID-19 pandemic.

145.   Additionally, as a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiff to a search without Due Process.

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 35 of 39 PageID #: 38

146.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

### SECOND CLAIM FOR RELIEF
**Excessive Force/Assault and Battery**
*Under New York State Law and pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

147.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

148.     Defendants used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

149.     The types and levels of force Defendants used against Plaintiff were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

150.     Defendants used types and levels of force against Plaintiff and other protesters that were in contravention of, or inconsistent with, related NYPD policies and/or training.

151.     The City of New York failed to investigate incidents of which they were aware or should have been aware in which NYPD members used excessive force against Plaintiff and other protesters.

152.    The City of New York failed to discipline NYPD members who used excessive force against Plaintiff and other protesters.

153.    Defendants used force against Plaintiff based on her position in or proximity to a perceived group, without first having given the perceived group clearly communicated, prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

154.    Plaintiff and/or other arrestees complained about the fact that her handcuffs were too tight and/or causing them injury.

155.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

### THIRD CLAIM FOR RELIEF

**First Amendment Infringements, Including First Amendment Retaliation**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution*

156.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

157.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff in

Case 1:21-cv-04092-WFK-VMS    Document 1-1    Filed 07/21/21    Page 37 of 39 PageID #: 40

subjecting Plaintiff to Defendants' Protest Arrest Processing Policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

158. Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

159. Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

160. Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff and others from engaging in similar protected conduct in the future.

161. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of the First Amendment rights.

162. Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims – including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline - with malice.

163. Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims in response to the perceived viewpoint and/or message expressed by Plaintiff.

Case 1:21-cv-04092-WFK-VMS Document 1-1 Filed 07/21/21 Page 38 of 39 PageID #: 41

164.     Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

165.     Additionally, the offenses charged against Plaintiff which Defendants might argue provided probable cause for Plaintiff's arrests, were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

166.     Plaintiff suffered actual chill in that she was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

## FOURTH CLAIM FOR RELIEF
### Municipal Liability
*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*

167.     Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

168.     All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto*

Case 1:21-cv-04092-WFK-VMS   Document 1-1   Filed 07/21/21   Page 39 of 39 PageID #: 42

policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by

Defendant City; (d) Defendant City's deliberate indifference to Plaintiff's rights secured

by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as

evidenced by the City's failures, and the failures of the City's policymaking agents, to

train, supervise, and discipline NYPD officers, despite full knowledge of the officers'

wrongful acts, as described herein.

PRAYER FOR RELIEF WHEREFORE, Plaintiff respectfully requests

judgment against Defendants as follows:

1.  awarding compensatory damages against the Defendants;

2.  awarding punitive damages in an amount to be determined at trial;

4.  awarding Plaintiff reasonable attorneys' fees and costs under

applicable law; and

5.  directing such other and further relief as the Court may deem just and

proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:  New York, New York
        June 21, 2021

WERTHEIMER LLC

By: _____

Joel A.  Wertheimer
14 Wall Street, Suite 1603
New York, New York 10005
(646) 720-1098
joel@joelwertheimer.com

38